UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

EDGARDO R.,                              :
                                         :
*Plaintiff,*                             :
                                         :
            v.                           :
                                         :          No. 3:19-cv-01874SDV
ANDREW M. SAUL,                          :
                                         :
Commissioner of                         :
Social Security,                         :
                                         :
*Defendant.*                             :
_____X

### <u>RULING ON PENDING MOTIONS</u>

This is an administrative appeal following the denial of the plaintiff, Edgardo R.'s

application for Title II disability insurance benefits ("DIB").  It is brought pursuant to 42 U.S.C.

§  1383(c).[1]  Plaintiff now moves for an order reversing the decision of the Commissioner of the

Social Security Administration ("the Commissioner" or "defendant").  Doc. No. 20.  The

Commissioner, in turn, has filed a motion for an order affirming the decision of the

Commissioner.  Doc. No. 30.  After careful consideration of the arguments raised by both

parties, and a thorough review of the administrative record, the Court: 1) **DENIES** plaintiff's

---

[1] Under the Social Security Act, the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]."  42 U.S.C. §1383(c)(1)(A). The Commissioner's authority to make such findings and decisions is delegated to administrative law judges ("ALJs"). *See* 20 C.F.R. §§ 404.929; 416.1429. Claimants can in turn appeal an ALJ's decision to the Social Security Appeals Council. *See* 20 C.F.R. §§ 404.967; 416.1467. If the Appeals Council declines review or affirms the ALJ opinion, the claimant may appeal to the United States District Court.  Section 205(g) of the Social Security Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C § 405(g).

Motion to Reverse the Decision of the Commissioner (Doc. No. 20); and 2) **GRANTS** defendant's Motion to Affirm the Decision of the Commissioner (Doc. No. 30).

## I.   <u>LEGAL STANDARD</u>

Under the Social Security Act, the term "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A claimant will meet this definition if his or her impairments are of such severity that the claimant cannot perform previous work and also cannot, considering the claimant's age, education, and work experience, "engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The Commissioner must follow a sequential evaluation process for assessing disability claims.  The five steps of this process are as follows: (1) the Commissioner considers whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities; (3) if the claimant has a "severe impairment," the Commissioner must ask whether, based solely on the medical evidence, the claimant has an impairment which "meets or equals" an impairment listed in Appendix 1 of the regulations (the Listings).  If so, and it meets the durational requirements, the Commissioner will consider the claimant disabled, without considering vocational factors such as age, education, and work experience; (4) if not, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has the residual functional capacity to perform his or her past work; and (5) if the claimant is unable to perform his or her past work, the Commissioner then determines

whether there is other work in the national economy which the claimant can perform.  *See* 20 C.F.R. §§ 404.1520; 416.920.  The claimant bears the burden of proof on the first four steps, while the Commissioner bears the burden of proof on the final step.  *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function."  *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981).  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.] "  42 U.S.C. § 405(g).  Accordingly, the district court may not make a *de novo* determination of whether a plaintiff is disabled in reviewing a denial of disability benefits.  *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the court's function is to first ascertain whether the Commissioner applied the correct legal principles in reaching his conclusion, and then whether the decision is supported by substantial evidence.  *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  Therefore, absent legal error, a decision of the Commissioner cannot be set aside if it is supported by substantial evidence.  *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  It must be "more than a mere scintilla or touch of proof here and there in the record."  *Id.*  If the Commissioner's decision is supported by substantial evidence, that decision will be sustained, even where there may also be substantial

evidence to support the plaintiff's contrary position.  *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982).

## II.      **PROCEDURAL HISTORY**

Plaintiff filed his DIB application on September 7, 2016.  (R.102).  The application originally alleged a disability onset date of December 31, 2008.  (R. 15).  The claimant later amended the alleged onset date to March 16, 2012.  (Ex. B20E).  The claim was denied at the initial and reconsideration levels.  (Exs. B2A, B6A).  Thereafter, plaintiff requested a hearing.  (R.7).  On June 8, 2018, a hearing was held before Administrative Law Judge Michael McKenna (hereinafter, the "ALJ").  (R. 39).  Plaintiff was not represented by counsel.  (R. 42).  On June 8, 2018, the ALJ found that there were missing medical records and gave plaintiff a continuance to get legal representation and to further develop the record.  (R. 42-46).  A second hearing occurred on October 12, 2018.  (R. 47).  Plaintiff, who was now represented by counsel, testified at the hearing.  (R. 47-101).  On November 21, 2018, the ALJ issued a decision denying plaintiff's claims.  (R. 15-25).  Plaintiff subsequently requested review of the ALJ's decision by the Appeals Council.  (R. 7).  On October 30, 2019, the Appeals Council denied review, making the ALJ's decision the final determination of the Commissioner.  (R. 1-3).  This action followed.

## III.     **FACTUAL BACKGROUND**

Plaintiff testified as follows at the administrative hearing.  Plaintiff was (49) forty-nine years old on the hearing date.  (R. 102).  He is a widower and has six children, five boys and one girl.  (R. 53).  At the time of the hearing, plaintiff lived with his sister.  (R. 54).  Plaintiff testified that he has a driver's license but has not driven in approximately five years.  (R. 54).  He usually takes public transportation.  (R. 54).  Plaintiff reported attending special education classes in

grade school.  (R. 63).  He received his GED while in jail and completed some years at a technical school.  (R. 55, 63-64).  Plaintiff speaks English. (R. 63).

Plaintiff reported working from 2003 to 2005 for Connecticut Dispatch Communications as a dispatcher for a taxi service.  (R. 55).  Plaintiff's responsibilities included communicating with operators, addressing complaints, answering phone calls, managing leases, counting money, inspecting vehicles and supervising three operators.  (R. 55-57).  As a dispatcher, plaintiff would be on his feet for about two hours a day.  (R. 58-59).  At times, he would lift 20 to 30 pounds, the approximate weight of a spare tire.  (R. 61).

In 2007, plaintiff began working for Ace Taxi Service.  (R. 59).  Like his previous job, plaintiff was a dispatcher.  (R. 59).  However, he only had one operator working under him.  (R. 59).  Plaintiff has not worked since 2008.  (R. 61).

Plaintiff reported having anger management issues his whole life.  (R. 66).  He spent nine years in jail, and approximately one and a half of those years in punitive segregation.  (R. 66).  He reported getting into physical altercations while in prison.  (R. 66-67).  Plaintiff spent time in the Northern Correctional Institution.  (R. 67).  He was in a single cell, underground, where there was no toilet seat.  (R. 67).

Plaintiff has a history of fighting.  (R. 69).  He testified that he has previously bitten people while infected with Human Immunodeficiency Virus (hereinafter, "HIV").  (R. 69).  He has been arrested for physical violence a couple of times – including an instance where he fought police officers.  (R. 83-85).

Plaintiff's wife died in 2004 from HIV.  (R. 70).  Plaintiff testified that he infected her with the disease, and that everything "came barreling down" after his wife passed away.  (R. 70-71).  Plaintiff's HIV is under control, and he receives significant support from the UCONN case

management team.  (R. 71-72).  Plaintiff's medications are pre-poured, so that he does not miss

any doses.  (R. 71).  Plaintiff also has a visiting nurse that helps manage his medication.  (R. 71).

He has three people managing his appointments and arranging for his transportation.  (R. 71-72).

Plaintiff stated that they help him fill out all his forms because he gets "stuck" and cannot

complete them.  (R. 74).  Plaintiff reported struggling with his ability to focus.  (R. 74).  Plaintiff

was diagnosed with sleep apnea but failed to obtain a continuous positive air pressure ("CPAP")

machine.  (R. 74-75).  Plaintiff never asked to have the machine delivered. (R. 74).

      Plaintiff did not have any plans to move out of his sister's house.  (R. 76).  He stated that

if he moved out on his own, he would have his case manager help him manage his bills and pay

everything on time.  (R. 77).  Plaintiff stated he was not responsible for any bills at the moment.

(R. 76-77).

      Plaintiff described suffering from various medical conditions.  Plaintiff has HIV and has

skin lesions that make it difficult in the summer and winter.  (R. 77).  Plaintiff testified that his

lesions are painful and fill with pus and blood.  (R. 78).  He reported that his monthly medication

costs $1,500 and he is unable to afford it.  (R. 78.)  He also suffers from leg cramps and oral

thrush.  (R. 79).  Plaintiff reported seeing his doctor five to six times a year for cold related

symptoms, like bronchitis and sore throats.  (R. 79).  Plaintiff also struggles with depression,

anxiety and has problems with the bottom of his feet.  (R. 79, 81, 90).  Plaintiff reported

suffering from back pain as a result of having been hit by a van.  (R. 80).  He testified that he had

to go to physical therapy for it.  (R. 80).  He missed a couple of appointments because of

transportation issues and severe weather.  (R. 80-81).

      Plaintiff does not do any chores but does have supervised visitation with his son.  (R. 87).

Plaintiff receives mental health treatments every week and sees a psychiatrist every six to eight

weeks.  (R. 89-90).  Plaintiff takes medication for his blood pressure, HIV, anxiety and depression.  (R. 90).

In addition to plaintiff's testimony at the administrative hearing, plaintiff's medical history concerning treatment for his impairments was set forth in Exhibit F. In general, he received treatment for his HIV from his infection disease doctor, Dr. Kevin Dieckhaus (*see* Ex. B12F). One of plaintiff's primary care providers is APRN, Mary Davidson-Price. (*See* Exs. B9F, B12F).  Plaintiff received mental health treatment from the Community Renewal Team, Inc. (hereinafter, "CRT"), mainly Dr. Mohinder Chadha, and APRN Alma Barretto. (*See* Ex. B17F).

## IV.    THE ALJ'S DECISION

The ALJ followed the sequential evaluation process to determine whether plaintiff was disabled under the Social Security Act.

At Step One, the ALJ found plaintiff did not engage in substantial gainful activity since September 7, 2016, the application date.  (R. 17).  At Step Two, the ALJ found plaintiff has the following severe impairments: major depressive disorder, bipolar disorder, adjustment disorder with anxiety and intermittent explosive disorder.  (R. 17).  At Step Three, the ALJ found plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  (R. 18-19).  Next, the ALJ determined plaintiff retains the following residual functional capacity[2]:

> [T]o perform a full range of work at all exertional levels but with the following non-exertional limitations: This individual is able to perform simple routine tasks; have occasional interaction with supervisors and coworkers; no tandem tasks;

---

[2] Residual functional capacity (hereinafter, "RFC") is the most a claimant can do in a work setting despite his or her limitations.  20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1).

incidental contact with the public and this individual is able to accept occasional changes to a routine work setting.

(R. 20).

At Step Four, the ALJ found plaintiff is unable to perform any past relevant work.  (R. 23).  Finally, at Step Five, the ALJ relied on the testimony of the Vocational Expert (hereinafter, "VE") to conclude that there are jobs existing in significant numbers in the national economy that plaintiff can perform.  (R. 24).  Specifically, the VE testified that a person with plaintiff's vocational factors and the assessed RFC can perform the positions of laundry laborer, dishwasher, and hand packager, of which there were approximately 10,000 jobs, 55,000 jobs and 30,000 jobs respectively in the national economy.  (R. 24).  Accordingly, the ALJ determined plaintiff "has not been under a disability, as defined in the Social Security Act, since September 7, 2016, the date the application was filed[.]"  (R. 24).

## V.   <u>DISCUSSION</u>

### a.   *The ALJ's Duty to Develop the Record*

Plaintiff first argues that the Court should reverse the ALJ's ruling because the ALJ failed to adequately develop the record.  Doc. No. 20-1, at 17-18.  Plaintiff mainly argues that the ALJ erred by rejecting "the functional assessments of the four state medical and psychology consultants[,]" and by failing to develop the mental health treatment records from Dr. Mohinder Chadha and other therapy providers.  *Id.*  For the reasons that follow, the Court finds that the ALJ has fulfilled his duty to develop the record.

The Court's role in reviewing a disability determination is not to make its own assessment of plaintiff's functional capabilities; it is to review the ALJ's decision for reversible error.  *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).  "It is the rule in our circuit that the ALJ, unlike the judge in a trial, must [him]self affirmatively develop the record in light of the

essentially non-adversarial nature of a benefits proceeding." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1997) (internal quotation marks omitted); *see Moreau v. Berryhill*, No. 3:17-CV-396 (JCH), 2018 WL 1316197, at *4 (D. Conn. Mar. 14, 2018) ("An ALJ in a social security benefits hearing has an affirmative obligation to develop the record adequately." (internal quotation marks omitted)). "Whether the ALJ has satisfied this obligation or not must be addressed as a threshold issue." *Id.* (internal quotation marks omitted). "Even if the ALJ's decision might otherwise be supported by substantial evidence, the Court cannot reach this conclusion where the decision was based on an incomplete record." *Id.* (quoting *Downes v. Colvin*, No. 14-CV-7147 (JLC), 2015 WL 4481088, at *12 (S.D.N.Y. July 22, 2015)). Remand for failure to develop the record is not necessary where "the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *See Tankisi v. Comm'r of Soc. Sec.*, 521 F.Appx 29, at 34 (2d Cir. 2013).

## 1.      The Non-Examining State Agency Medical Consultants

The ALJ attributed "little weight" to the opinions of the non-examining State agency medical consultants because plaintiff failed to attend his consultative examinations and failed "to respond to their contact attempts." (R. 22). If a claimant fails to attend a scheduled consultative examination without "a good reason," a finding of not disabled may be rendered. 20 C.F.R. § 404.1518(a). Examples of "good reasons" include: "(1) Illness on the date of the scheduled examination or test; (2) Not receiving timely notice of the scheduled examination or test, or receiving no notice at all; (3) Being furnished incorrect or incomplete information, or being given incorrect information about the physician involved or the time or place of the examination or test, or; (4) Having had death or serious illness occur in [the claimant's] immediate family." 20 C.F.R. §404.1518(b); *see also Perrelli v. Comm'r of Soc. Sec*, No. 18-CV-4370 (KAM), 2020

WL 2836786, at * 5 (E.D.N.Y. June 1, 2020).  Courts in this Circuit have held that where a claimant fails to appear at a scheduled consultative examination without explanation, the ALJ has no further duty to develop the record and the claim is most often decided on the basis of the available evidence.  *See Cornell v. Astrue*, 764 F. Supp. 2d 381, 392 n.8 (N.D.N.Y. 2010); *see also Matta v. Colvin*, 2016 WL 524652,W at *10 (S.D.N.Y. Feb. 8, 2016) ("[W]here claimants have refused to acknowledge, attend, or cooperate at scheduled consultative examinations or have failed to argue that they had good reasons for not attending such examinations, courts have rejected claims that the ALJ failed to develop the record.").

Here, the ALJ attributed little weight to the consultative examinations because plaintiff failed to attend.  "[The State agency medical consultants] did not have the opportunity to interview the claimant or to review all available medical evidence entered into the record."  (R. 22).  At no time does plaintiff argue that he had "good reasons" for not attending the consultative exams.  Plaintiff also does not argue that he did not have notice of the consultative exams.  *See* Ex. B2A, at 107-108 ("[Claimant] missed a med and psych [consultative exam] and has not responded to recent letter or phone calls….[Claimant] has not been cooperative with attempts at case development. He missed a scheduled [consultative exam] and did not respond to contact efforts. At this point, we have [i]nsufficient [e]vidence."); *see also* Ex. B6A, at 135 ("Th[e] evidence we now have does not show that [plaintiff's] condition is disabling. We based our determination on this evidence because [plaintiff] did not take the medical examination we asked [him] to have at our expense.").  This Court is not persuaded by plaintiff's argument that "the

ALJ had an obligation [to] submit the file for medical and psychological review post hearing"
when he failed to attend all consultative examinations.  Doc. No. 20-1, at 17.

Furthermore, this Court notes that plaintiff has a long history of failing to attend his
medical appointments.  On July 10, 2017, plaintiff was discharged from CRT for failing to attend
his scheduled appointments, and the clinician wrote that he could not "report on the status of
[the] client at the time of discharge. Multiple attempts have been made to re-engage the client
back into treatment with no success."  (R. 1266).  The clinician was unable to assess the plaintiff
due to "lack of client contact."  (R. 1266).  Plaintiff re-engaged with CRT only to be discharged
again.  (R. 1302).  On April 26, 2018, plaintiff was again discharged from CRT because he
"stopped showing up to his scheduled appointments."  (R. 1302).  Plaintiff was also discharged
for non-compliance from physical therapy.  (R. 513) ("[Patient] has had poor compliance with
2x/week PT sessions with no shows and cancels due to weather and also a temporary loss of
insurance. He [] failed to show for his last scheduled rx.").  It is clear from the historical record
that plaintiff frequently failed to attend scheduled medical appointments, and his failure to attend
the consultative examinations is certainly consistent with this pattern.

In light of plaintiff's failure to attend the consultative examinations and to fulfill his
obligations to facilitate those consultations, the ALJ did not have any further duty to develop the
record with respect to those consultants' records.

### 2.    **Missing Records**

Plaintiff also argues that the ALJ erred by not obtaining records from plaintiff's treating
psychiatrist, Dr. Mohinder Chadha from CRT as well as other group therapy treatment records.
The absence of treatment records from a treating physician is not necessarily cause for remand.
*Crespo v. Comm'r of Soc. Sec.*, No. 3:18-CV-435 (JAM), 2019 WL 4686763, at *3 (D. Conn.

Sept. 25, 2019) (citing *Tankisi,* 521 F.Appx 34).  "A medical source statement is not necessarily required to fully develop the record where "the record contains sufficient evidence from which an ALJ can assess the [claimant's] residual functional capacity."  *Id*.  Likewise, "remand is not necessary merely because an explicit function-by-function analysis was not performed." *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

Here, although the record might lack treatments notes from Dr. Chadha or plaintiff's group therapy provider, it does include a medical report from APRN, Alma Barretto, one of plaintiff's mental health providers at CRT, where plaintiff treated in 2013 and again between February 2016 and September 2018, which details plaintiff's functional limitations. (*See* Exs. B13E, B1F, B17F).  The record also includes plaintiff's November 25, 2013, intake assessment from CRT where he self-reported statements about his functional abilities.  ( R. 417-431).  For the foregoing reasons, the Court finds that there was substantial evidence for the ALJ to discern plaintiff's RFC.

On November 25, 2013, plaintiff underwent an initial intake assessment at CRT where he reported that he was not currently "hearing voices or seeing anything," but had in the past.  (R. 422).  He also reported feeling anxious, depressed, and angry.  (R. 422).  Kerry Salb, the intake clinician, reported that plaintiff's thought organization, perception and thought content were all normal, and plaintiff had "no impairment" with his remote or immediate memory.  (R. 424).  In her February 5, 2018, medical report, APRN Barretto, plaintiff's treating mental health provider, opined on plaintiff's overall capacity in the areas of understanding and memory, sustained concentration, social interaction and adaptation, and she assessed his functional limitations.  (R. 318-325.).  APRN Barretto, who was explicitly aware at this time that Dr. Chadha had treated plaintiff at CRT, reported that his "ability to tolerate anger has improved[,]" and that plaintiff has

"been able to focus during individual sessions."  (R. 318).  APRN Barretto found plaintiff to be moderately limited in a majority of the categories, including in his ability to "remember locations [and] work-like procedures[;]" "understand and remember very short, simple instructions[;]" "remember detailed instructions[;] and "maintain attention and concentration for extended periods of time."  (R. 322).  APRN Barretto found that plaintiff was not significantly limited in his ability to "ask simple questions or request assistance" or his ability to "accept instructions and respond appropriately to criticism from supervisors."  (R. 323).  Given her explicit knowledge that Dr. Chadha had treated claimant at CRT, it is a reasonable inference that she was aware of the history of that treatment in formulating her opinions as to functional capacity. Accordingly, there was no further need for the ALJ to obtain Dr. Chadha's treatment notes.

Overall, the ALJ discussed his reliance upon the "claimant's history of treatment for anxiety, depression and substance abuse" and the "mental status evaluations from [CRT]" in determining plaintiff's mental limitations in the RFC.  (R. 22).  Accordingly, under the substantial evidence standard, the Court finds that a reasonable mind may conclude that the ALJ relied on sufficient evidence to formulate plaintiff's RFC.  Therefore, the Court finds that the ALJ fulfilled his duty to develop the record and remand is not warranted on this issue.

Plaintiff also argues that the ALJ erred by failing to obtain a copy of a Medical Source Questionnaire (MSQ) that was in evidence at the initial review level.  Doc. 20-1, at 18.  While the ALJ "has an affirmative duty to develop the administrative record even when a claimant is represented by counsel, where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim."  *Lowry v. Astrue*, 474 F.Appx 801, 804 (2d Cir. 2012) (internal citation and quotation marks omitted).  Furthermore, "[w]hen

an unsuccessful claimant files a civil action on the ground of inadequate development of the

record, the issue is whether the missing evidence is significant." *Santiago v. Astrue*, No. 3:10–

CV–937 (CFD), 2011 WL 4460206, at *2 (D. Conn. Sept. 27, 2011) (citing *Pratts*, 94 F.3d at

37–38). Plaintiff "must show that he was harmed by the alleged inadequacy of the record." *Id*.

(citing *Shinseki v. Sanders*, 129 S.Ct. 1696, 1706 (2009)). Here, there are no obvious gaps in the

administrative record suggesting that the ALJ did not possess a complete medical history. While

plaintiff argues that the MSQ was not in evidence, a summary of it can be found in plaintiff's

Initial Disability Determination. (R. 120). The summary reports the following:

> We have an msq on file, from 10/29/13 through 10/13/16 with AMS dx bipolar d/o and
> hallucinogen abuse, in remission. When abstinent, [activities of daily living] and
> functioning within normal limits. No hospitalizations. Moderately compliant with therapy
> and med management. Impaired attention, concentration, and short-term memory….mild
> impairment is rated in these capacities: interpersonal skills generally OK, but [claimant]
> has difficulty asking for help.

(R. 120). The consult note states that the physician who signed the MSQ, is Dr. Kevin

Dieckhaus, an infection disease doctor, not a mental health provider. (R. 120); s*ee* Ex. B5F, at

519-529 (Comment by Dr. Kevin Dieckhaus stating: "please note that I feel that this patient's

Mental Health Provider should be asked to complete this form – strongly suspect that he meets

criteria based on Mental Health function; but this is not the focus of my visits with him"). (R.

529). The ALJ's decision would not have been affected by the MSQ, because not only was a

summary of the MSQ in the record, but also, the MSQ's signatory was Dr. Dieckhaus, plaintiff's

infectious disease doctor, not his mental health provider. Further, the administrative record

contained multiple medical notes from Dr. Dieckhaus from 2014-2018 illustrating the history

and chronology of his treatment of plaintiff. (Ex. B12F).

     The Court also notes that while Dr. Dieckhaus relayed concern about plaintiff's mental

impairment on his medical report dated November 2014, Dr. Dieckhaus continued to treat

plaintiff through 2017.  *See* Ex. B12F.  At no time in Dr. Dieckhaus' subsequent treatment

records from 2013 to 2017 does he mention any additional concern for plaintiff's mental

impairments.  *See* Ex. B12F.  In fact, Dr. Dieckhaus' treatment notes on June 15, 2015, indicate

that "[plaintiff] has been stable on his  psychotropic medications."  (R. 1046).  Dr. Dieckhaus

also noted that plaintiff "was doing well from an HIV standpoint" (R. 1007), that plaintiff was

compliant with medication (R. 977, 981), and that he "had generally low viral loads that [were]

undetectable since 2016 (R. 981-982).  In short, in light of the available records from Dr.

Dieckhaus that were before the ALJ, the plaintiff's claim that the ALJ failed to develop the

record on the grounds of the missing MSQ is unpersuasive.

### b.  The ALJ's Step Two Analysis of Plaintiff's Physical Impairments

Plaintiff also argues that the ALJ erred at Step Two in finding that plaintiff's obesity,

hypertension, obstructive sleep apnea, HIV infection, follicular lesions, methicillin-resistant

staphylococcus aureus infection, metacarpal fracture and uncomplicated cannabis abuse were not

severe impairments.  Doc. No. 20-1 at 9.

At Step Two, the ALJ determines the severity of a plaintiff's impairments.  *See* 20 C.F.R.

§§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c).  At this

step, a plaintiff carries the burden of establishing that he is disabled and must provide the

evidence necessary to make determinations as to his disability.  *See* 20 C.F.R. §§ 404.1512(a),

416.912(a).  An impairment is "severe" if it significantly limits an individual's ability to perform

basic work activities.  *See* SSR  96–3p, 1996 WL 374181, at *1 (S.S.A. July 2, 1996).  An

impairment is "not severe" if it constitutes only a slight abnormality having a minimal effect on

an individual's ability to perform basic work activities.  *See id*.

If the ALJ finds any impairment to be severe, "the question whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence." *Jones-Reid v. Astrue*, 934 F. Supp. 2d 381, 402 (D. Conn. 2012), aff'd, 515 F. Appx 32 (2d Cir. 2013) (citation and quotation marks omitted). "Under the regulations, once the ALJ determines that a claimant has at least one severe impairment, the ALJ must consider all impairments, severe and non-severe, in the remaining steps." *Pompa v. Comm'r of Soc. Sec.*, 73 F. Appx 801, 803 (6th Cir. 2003) (citation omitted). Therefore, if the ALJ considers all impairments at subsequent stages of the analysis, failure to find a particular condition "severe" at Step Two, even if erroneous, constitutes harmless error. *See O'Connell v. Colvin*, 558 F. Appx 63, 65 (2d Cir. 2014) ("Because this condition was considered during the subsequent steps, any error [in finding it not to be severe at Step Two] was harmless."); *Reices-Colon v. Astrue*, 523 F. Appx 796, 798 (2d Cir. 2013) (same). Non-severe impairments are considered if they are found to be "medically determinable ... impairments." 20 C.F.R. §§ 404.1521, 416.921. Such impairments must result from "anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. Therefore, a physical or mental impairment must be established by objective medical evidence from an acceptable medical source." *Id*. A claimant will be found disabled only if the medically determinable impairment causing disability "has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). The SSA advises claimants: "[w]e will consider only impairment(s) you say you have or about which we receive evidence." 20 C.F.R. §§ 404.1512(a)(1), 416.912(a)(1).

Here, the ALJ found that plaintiff had the following severe impairments: major depressive disorder, bipolar disorder, adjustment disorder with anxiety and intermittent explosive disorder.  (R. 17).  As to claimed physical impairments, the ALJ found that plaintiff's

> obesity, hypertension, obstructive sleep apnea, human immunodeficiency virus infection, lesions, methicillin-resistant staphylococcus aureus infection, metacarpal fracture and uncomplicated cannabis abuse are non-severe impairments because they do not significantly limit the claimant's physical or mental ability to perform work-related activities.

(R. 18).  The ALJ made no mention at Step Two of degenerative disc disease, plantar fasciitis or recurrent hypokalemia/rhabdomyolysis.

Plaintiff seems to argue that the ALJ erred by finding that plaintiff's obesity, hypertension, obstructive sleep apnea, human immunodeficiency virus infection, lesions, methicillin-resistant staphylococcus aureus infection, metacarpal fracture and uncomplicated cannabis abuse were not severe impairments.  Doc. No. 20-1, at 9.  Because the ALJ found that plaintiff had other severe impairments at Step Two, he is required to consider plaintiff's severe and non-severe impairments in subsequent steps of evaluation.  *See Pompa*, 73 F. Appx at 803. A review of the ALJ's decision reveals that the ALJ satisfied this requirement.  The ALJ adequately considered plaintiff's non-severe impairments throughout the ruling.  The ALJ considered plaintiff's testimony regarding the impact of his impairments on his ability to work. (*See* R. 20) ("The claimant alleges he is unable to work due to symptoms of chronic diffuse body pain, neck, back and foot pain, infections and a rash related to the human immunodeficiency virus infection.").  The ALJ also considered plaintiff's successful treatment with HIV where plaintiff's laboratory findings showed that "claimant's viral load was virtually undetectable."  (R. 21).  The ALJ considered plaintiff's successful treatment of his follicular rashes, where the record revealed that the rashes cleared up with medication.  (*Id.*).  The ALJ identified multiple

severe impairments at Step Two.  (R. at 17).  He then proceeded to the subsequent steps of

analyzing the claimant's disability status.  (*Id*. at 18-25).  Because the analysis did not stop at

Step Two—this would have required a finding that the claimant had no severe impairments and

was thus not disabled—the ALJ did not prejudice the claimant by not recognizing further

impairments.  *See Stanton v. Astrue*, 370 F. Appx 231, 233 n. 1 (2d Cir. 2010).  Accordingly,

plaintiff's argument that the ALJ erred at Step Two regarding plaintiff's various non-severe

impairments is unpersuasive.

While the ALJ made no mention of plaintiff's alleged degenerative disc disease, plantar

fasciitis or recurrent hypokalemia/rhabdomyolysis at Step Two, he did discuss plaintiff's

treatment of said conditions in the remaining parts of his subsequent evaluation.  The ALJ

reported that calcium supplements "decreased [plaintiff's] symptoms of leg cramps" and that

"[plaintiff's] complaints of lower extremity pain were treated conservatively with compression

stockings and shoe inserts and his examination findings showed normal muscle strength and

tone, no abnormal focal finds and normal gait and station."  (R. 21-22).

Furthermore, this Court finds that the ALJ thoroughly considered the evidence before

him when determining plaintiff's physical condition, and the ALJ's findings are supported by

substantial evidence.  Any conflict between the plaintiff's testimony and the medical evidence is

left for the ALJ to settle.  It is the function of the ALJ, not the reviewing court, to "resolve

evidentiary conflicts and appraise the credibility of the witness, including the claimant."  *Carroll

v. Sec'y. of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).  The ALJ adequately

considered the competing evidence.  The ALJ wrote:

> As for the claimant's statements about the intensity, persistence, and limiting effects of
> his or her symptoms, they are inconsistent because the overall medical evidence of record
> does not support the level of limitation alleged. The medical records pertaining to the
> treatment for human immunodeficiency virus infection included laboratory findings

showing the claimant's viral load was virtually undetectable. He experienced no side
effects from his medications and he was compliant with them. While he complained of
and sought treatment for a follicular rash, his records revealed that it cleared up with
prescribed medication and his medical reports do not contain complaints of any diffuse
pain to the extent alleged in the hearing testimony. The record reflects the claimant was
referred to physical therapy for his back pain, but he was discharged for missing
appointments. While the claimant complained of fatigue related to sleep apnea, he failed
to follow through with prescribed treatment using a continuous positive airway pressure
machine.

(R. 21) (internal citations omitted). Additionally, the ALJ relied on plaintiff's statements to a

treatment provider in January 2014, that plaintiff's "back pain did not interfere with his ability to

perform activities of daily living." (R. 21). The ALJ also considered the fact that "claimant did

not seek medical treatment after a van struck him in December 2013 and he did not lose

consciousness. Although he reported the car's mirror struck his left shoulder, on examination his

range of motion was full and no weakness was present in his upper extremities." (R. 21). The

plaintiff underwent physical therapy treatment after he was struck by the van, and his treatment

notes indicate that his condition improved with therapy. (*See* Ex. B4F). On February 4, 2014,

plaintiff's physical therapist wrote, "[p]ain improved with therapy today....Patient demonstrates

improved [Range of Motion]." (R. 506). Again, on February 6, 2014, plaintiff's physical

therapist wrote, "[p]atient tolerated treatment and reports improvement in symptoms and

impairments." (R. 507). On February 25, 2014, the notes indicate that plaintiff's pain was

"0/10" with "no increase with advancement of activity." (R. 510). Despite plaintiff's recorded

progress, on March 20, 2014, he was discharged from physical therapy "for noncompliance[,]"

and for failing to show for his scheduled treatment. (R. 513). In any event, a medical note from

CRT as recent as July 23, 2018 indicates that claimant has no chronic pain. (R. 1310-1311). An

additional medical note from UConn Health Center from August 23, 2018 states that "physically

he has been doing well - has intermittent back pain - associated with certain physical activities."

(R. 1225). The medical records also support the ALJ's conclusions as to claimant's impairment

of sleep apnea.  While plaintiff was diagnosed with moderate obstructive sleep apnea in

September 2014, it was also recommended that he obtain a CPAP machine.  (R. 702-705).

Claimant was reminded on September 3, 2015, approximately one year later, that he "must call []

to arrange for CPAP." (R. 1156).  Nonetheless, by the time he testified at the administrative

hearing in October 2018, he still had not made efforts to secure the CPAP machine.  (R. 74-75).

Lastly, in terms of plaintiff's plantar fasciitis, plaintiff's treatment provider, APRN Mary

Davison-Price opined on September 3, 2015, that "[plaintiff's] plantar fasciitis symptoms have

completely resolved[.]"  (R. 1028).  Accordingly, this Court finds that the ALJ's omission of

plaintiff's alleged degenerative disc disease, plantar fasciitis or recurrent hypokalemia/

rhabdomyolysis at Step Two was harmless.

### c.   *The ALJ's Step Three Analysis of Plaintiff's Mental Impairments*

Next, plaintiff appears to challenge the analysis the ALJ conducted of plaintiff's mental

impairments – principally arguing that the ALJ's Step Three findings were insufficient.  Doc.

No. 20-1 at 2.  At Step Three, the ALJ determined that plaintiff's impairments, either alone or in

combination, did not meet or medically equal the severity of any of the listed impairments in 20

C.F.R. pt. 404, Subpt. P, App. 1.  (*See* R. 18).  Plaintiff seems to argue that the ALJ erred in his

assessment of the severity of plaintiff's mental impairments.  Plaintiff largely argues that the

"ALJ's fact offerings suggest a complete inability to live life independently….the [ALJ's]

decision offered not a single fact showing that [R.] has the ability to perform the[] four

categories of mental functions in a sustained, remunerated environment."  Doc. No. 20-1, at 9.

Specifically, plaintiff argues that the ALJ failed to properly consider evidence regarding

plaintiff's poor memory (*id.*, at 3); inability to manage oneself (*id.*); lack of capacity for social

functioning and his inability to interact appropriately with others, including authority figures,

supervisors, and co-workers (Doc. No. 20-1, at 4-5); problems with following up with lawyers or attending medical appointments (*id.*, at 7-8); need for medication management providers (*id.*, at 8); and frequent job-loss (*id.* at 8-9).

While an ALJ "should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment," the absence of an express rationale for an ALJ's conclusions does not prevent us from upholding them so long as we are "able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence." *Berry v. Schweiker*, 675 F.2d 464, 469 (2d. Cir. 1982). "The Social Security regulations list certain impairments, any of which is sufficient, at step three, to create an irrebuttable presumption of disability. The regulations also provide for a finding of such a disability per se if an individual has an impairment that is 'equal to' a listed impairment." *DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998) (citation omitted); *see also* 20 C.F.R. §§ 404.1520(d), 416.920(d). Plaintiff bears the burden of establishing that his conditions meet a listing. *See Conetta v. Berryhill*, 365 F. Supp. 3d 383, 396 (S.D.N.Y. 2019). "To show that he meets the criteria, [plaintiff] must offer medical findings equal in severity to all requirements, which findings must be supported by medically acceptable clinical and laboratory diagnostic techniques." *Id*. (citation and quotation marks omitted). "To match an impairment in the Listings, the claimant's impairment must meet all of the specified medical criteria of a listing." *Raymond v. Comm'r of Soc. Sec.*, 357 F. Supp. 3d 232, 237 (W.D.N.Y. 2019) (citation omitted).

Here, the ALJ found that "[t]he severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, and 12.08." (R. 18). Despite plaintiff's arguments to the contrary, the ALJ's opinion considered many of plaintiff's mental impairments. The ALJ considered: 1) the results of the mental status

evaluation from CRT from November 2013 (R. 18); 2) plaintiff's March 2017 treatment plan

indicating that he "was unable to focus on the calendar and make appointments due to poor

memory" (*id.*); 3) treatment notes from January 2018 describing plaintiff as a "poor historian"

(*id.*); 4) reports from January 2018 that plaintiff became angry and began punching walls which

resulted in a fractured hand (R. 19); and failure to attend medical and legal appointments, and

eventual discharge from treatment for non-attendance (*id.*). Against this evidence, the ALJ was

permitted to consider evidence about R.'s life and daily activities, specifically, the ALJ

considered plaintiff's 1) mental status findings from July 2018 revealing "normal recent

memory" (R. 19); 2) the CRT intake assessment describing plaintiff as "cooperative, guarded

and friendly" (*id.*); 3) plaintiff's reports of getting along with family members and feeling

supported by them, (*id.*); 4) CRT's descriptions of plaintiff as neat and well groomed (*id.*); 5)

plaintiff's successful completion of a GED program, and ability to use public transportation (*id.*);

and 6) his enrollment in a substance abuse program (R. 19).  Although plaintiff may object to

how the ALJ weighed different pieces of evidence, where substantial evidence supports the

ALJ's conclusion, it is not for this Court to substitute its judgment for that of the Commissioner.

*See Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).  The ALJ provided an extensive

discussion of the evidence he considered in making his Step Three findings that plaintiff only

had "mild" and "moderate" limitations in each of the paragraph B areas of mental functioning.

Moreover, in the ALJ's subsequent evaluation he expanded on his findings as to

plaintiff's mental impairments. The ALJ considered that plaintiff had "not had any inpatient

psychiatric treatment since the amended alleged onset date."  (R. 22).  The ALJ noted that

plaintiff's "counselors observed the claimant was anxious and depressed, [however] his cognitive

functioning was essentially normal and treatment goals were based upon dealing with his grief

over life losses and social isolation." (R. 22).  The ALJ considered plaintiff's frequency in missing medical appointments and found that the "claimant was discharged from [his mental health] program again in late September 2018 for non-compliance with scheduled appointments despite reminders and he was given a poor prognosis due to his not being invested in his treatment." (R. 22).  In light of the foregoing, the Court finds that the ALJ's conclusions at Step Three regarding plaintiff's mental disorders are supported by substantial evidence.

### d.  *The ALJ's Weighing of Opinion Evidence*

Lastly, plaintiff argues that the undersigned should reverse the decision of the Commissioner because "the ALJ erred in his credibility assessment."  Doc. No. 20-,1 at 20. However, a more careful review of plaintiff's claim reveals that he actually objects to the ALJ's weighting and consideration of medical evidence provided by plaintiff's medical providers – rather than an objection as to plaintiff's credibility.  Specifically, plaintiff argues that "the ALJ failed to consider the opinions of Dr. Chadha, [R.'s] psychiatrist; Kevin Dieckhaus, MD, the HIV specialist; Alma Barreto, APRN and Otto Alemano, LCSW, [R.'s] prescriber and therapist or the disability determination of the state of Connecticut medical review team." *Id*. (citations omitted).  Plaintiff's objections are governed by the substantial-evidence standard.  For the reasons that follow, and for the reasons discussed above in Section I, II, and III, the Court finds that the ALJ adequately weighed the opinion evidence and remand is not warranted.  The Court concurs with the analysis of the Commissioner that the ALJ's analysis of the opinion evidence was supported by substantial evidence.

The Social Security Regulations define the RFC as "the most [a claimant] can still do despite [the claimant's] limitations."  20 C.F.R. § 416.945(a)(1).  "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing

specific medical facts … and nonmedical evidence[.]"  *Cobb v.* Astrue, 613 F. Supp. 2d 253, 258 (D. Conn. 2009) (citing to SSR 96-8P, 1996 WL 374184, at *7).  The RFC determination necessarily involves the ALJ evaluating the opinions of the various medical professionals that treated a claimant.  *Warrick v. Saul*, No. 3:19-cv-674(SALM), 2020 WL 2537459, at *6 (D. Conn. May 19, 2020).  "With respect to the nature and severity of [a claimant's] impairment(s), [t]he SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant."  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citations and quotations omitted).  When evaluating a treating source's opinion on the nature or severity of a claimant's impairments, the treating source's opinion will be given controlling weight when it is well-supported by, and consistent with, other substantial evidence in the record.  *See* 20 C.F.R. § 404.1527(c)(2).  The opinion will not be given controlling weight if it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques[.]"  20 C.F.R. § 416.927(c)(2).  In evaluating the consistency of a medical opinion, "[t]he Second Circuit has repeatedly held that an ALJ may give a treating source's medical opinion less weight where it contradicts their own treatment notes."  *Negron v. Colvin*, No. 15-CV-2515(ADS)(AKT), 2017 WL 1194470, at *7 (E.D.N.Y. Mar. 31, 2017), *aff'd Negron v. Berryhill*, 733 F. Appx 1 (2d Cir. 2018).

The ALJ is required to "comprehensively set forth his reasons for the weight assigned to a treating physician's opinion."  *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004).  In doing so, the ALJ must provide "good reasons" for the weight assigned.  *Burgess*, 537 F.3d at 129. However, an ALJ is not required to "slavish[ly] recite[ ] each and every factor where the ALJ's reasoning and adherence to the regulation are clear."  *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013).  The ALJ is also not required to have the RFC "perfectly correspond with any of the

opinions of medical sources." *Matta v. Astrue*, 508 F. Appx 53, 56 (2d Cir. 2013). Rather, an

ALJ is "entitled to weigh all of the evidence available to make an RFC finding that [is]

consistent with the record as a whole." *Id.*

Plaintiff raises general weighting issues regarding all the opinion evidence in the record.

Although plaintiff's legal arguments are difficult to decipher, the issue appears to center, in part,

on whether the ALJ improperly assigned "some weight" to APRN Milaney's psychiatric

evaluation of plaintiff. In her August 2018 assessment, APRN Milaney noted the following:

> First time meeting patient today. He is reluctant to discuss his psychiatric or other history stating "you guys keep changing people, I'm tired of telling my story over and over again, it should all be in my record"....[Plaintiff] states his anger has been under control since he has been taking the Lexapro, Abilify and Depakote….[Plaintiff was] dressed appropriate to season, guarded, normal speech, irritable mood and affect that was pleasant and euthymic by session end, logical and organized thoughts, denies psychosis….Plaintiff does not meet criteria for a Bipolar disorder based on history provided. He does meet criteria for substance abuse and Intermittent Explosive Disorder, in remission with current medication. Patient is not psychiatrically disabled. He should and could work. He would benefit from the structure and reward employment affords.

(R. 1336). Plaintiff appears to argue that APRN Milaney was bothered by plaintiff's demeanor

at the time of his visit, and as a result APRN Milaney opined that plaintiff was not

"psychiatrically disabled." Doc. No. 20-1, at 22-23. Plaintiff states that APRN Milaney's

"unsolicited opinion about not being psychiatrically disabled was incorporated into the record

after [R.] had rankled her and after he told her he was applying for SSDI [sic]. Doc. No. 20-1, at

23. Plaintiff later writes that APRN Milaney "tried to torpedo his claim[.]" Doc. No. 20-1, at

18. The Court finds that there is no evidence in the record that APRN Milaney's opinion of

plaintiff was the result of ill-will between the two.

Defendant responds by arguing that the ALJ appropriately weighed APRN Milaney's

opinion because she specializes in mental health and her findings are consistent with the record

as a whole, and the ALJ considered the fact that APRN Milaney was meeting plaintiff for the first time.  Doc. No. 30-1, at 17.

The Court finds that the ALJ appropriately gave some weight to APRN Milaney's assessment of plaintiff because APRN Milaney specializes in this area and her findings were consistent with other evidence in the record that showed improvement of plaintiff's mental impairments. The ALJ wrote:

> Although [APRN Milaney] examined the claimant once, I gave this opinion some weight due to her area of expertise and the objective findings and observations of the claimant, which showed stable psychiatric symptoms with medication management. I considered her observations of his mood and affect, which the observations of other treating sources supported in his treatment records by including the social limitations in the mental [RFC].

(R. 23).  APRN Milaney's observations are consistent with APRN Barretto's opinion that plaintiff had demonstrated some improvement.  APRN Barretto opined that the "[c]lient's ability to tolerate anger ha[d] improved[,]" and that he "ha[d] also been able to focus during individual sessions."  (R. 318).  Furthermore, on a July 23, 2018 assessment, Otto Aleman, plaintiff's licensed clinical social work, noted that "[d]uring the intake client was able to focus and respond to every question he was asked for approximately 1.5 hours."  (R. 1322).

Plaintiff also contends that the ALJ erred because "there was no mention of the February 5, 2018 medical report by Alma Barretto[,] APRN[,] and Otto Alemano, LCSW[,] stating that [R.] has [a] diminished capacity."  Doc. No. 20-,1 at 21.  However, the Court finds that the ALJ did consider this medical report.  As previously mentioned, the ALJ based the RFC, in part, on plaintiff's "mental status evaluations from [CRT] [which] support the limitation to performing simple tasks and accepting occasional changes to a routine work setting."  (R. 22).  The medical report by APRN Barretto is among the various mental evaluations that were undertaken at CRT.  Moreover, APRN Barretto's findings are consistent with and support the ALJ's conclusions.

Accordingly, the Court is not persuaded and finds that there was no error in the ALJ's weighing of the opinion evidence.

## VI.    **CONCLUSION**

For the reasons set forth above, the Court orders that plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 20) be **DENIED**, and defendant's Motion to Affirm the Decision of the Commissioner (Doc. No. 30) be **GRANTED**.

This is not a recommended ruling. The consent of the parties allows this magistrate judge to direct the entry of a judgment of the District Court in accordance with the Federal Rules of Civil Procedure. Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. §636(c)(3); Fed. R. Civ. P. 73(c).

SO ORDERED, this 30th day of September 2021 at Bridgeport, Connecticut.

*/s/ S. Dave Vatti*
S. DAVE VATTI
United States Magistrate Judge